UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

VICTOR MUÑOZ SERRANO

    Plaintiff,

       vs.

3M COMPANY (f/k/a MINNESOTA
MINING AND MANUFACTURING
COMPANY);
AGC CHEMICALS AMERICAS, INC.;
ALLSTAR FIRE EQUIPMENT CO.;
AMEREX CORPORATION;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BUCKEYE FIRE EQUIPMENT
COMPANY;
CARRIER FIRE & SECURITY
AMERICAS CORPORATION (f/k/a UTC
FIRE & SECURITY AMERICAS
CORPORATION, INC.);
CARRIER GLOBAL CORPORATION;
CB GARMENT, INC.;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS INCORPORATED;
CHUBB FIRE, LTD;
CLARIANT CORP.;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DUPONT DE NEMOURS, INC. (f/k/a
DOWDUPONT, INC.);
DYNAX CORPORATION;
EIDP, INC. (f/k/a E.I. DU PONT DE
NEMOURS AND COMPANY);
FIRE-DEX, LLC;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY,
LLC;
HONEYWELL SAFETY PRODUCTS
USA, INC.;
INNOTEX CORP.;

Civil Action No._____

COMPLAINT FOR DAMAGES

DEMAND FOR JURY TRIAL

JOHNSON CONTROLS, INC.;
KIDDE PLC, INC.;
LION GROUP, INC.;
L.N. CURTIS & SONS;
MILLIKEN & COMPANY;
MSA SAFETY, INC.;
MUNICIPAL EMERGENCY SERVICES,
INC.;
NATION FORD CHEMICAL COMPANY;
NATIONAL FOAM, INC.;
PBI PERFORMANCE PRODUCTS, INC.;
PERIMETER SOLUTIONS LP;
RICOCHET MANUFACTURING CO.,
INC.;
SAFETY COMPNENTS FABRIC
TECHNOLOGIES, INC.;
SOUTHERN MILLS, INC.;
STEDFAST USA, INC.;
THE CHEMOURS COMPANY;
THE CHEMOURS COMPANY FC, LLC;
TYCO FIRE PRODUCTS LP, AS
SUCCESSOR-IN-INTEREST TO THE
ANSUL COMPANY;
UNITED TECHNOLOGIES
CORPORATION (n/k/a RTX
CORPORATION);
VERIDIAN LIMITED;
WITMER PUBLIC SAFETY GROUP,
INC.;
W.L. GORE & ASSOCIATES, INC.,

     Defendants.

**TO THE HONORABLE COOURT:**

COMES NOW, Plaintiff, Victor Muñoz Serrano, by and through undersigned counsel, and alleges upon information and belief as follows:

## **INTRODUCTION**

1.    Plaintiff brings this action for damages for personal injury resulting from exposure to aqueous film-forming foams ("AFFF") and/or firefighter turnout gear ("TOG") containing the

toxic chemicals collectively known as per and polyfluoroalkyl substances ("PFAS"). PFAS includes, but is not limited to, perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") and related chemicals including those that degrade to PFOA and/or PFOS.

2.      AFFF is a specialized substance designed to extinguish extremely hot fires involving materials like alcohol, petroleum greases, and other flammable or combustible liquids and gases ("Class B Fires"). AFFF has been used for decades by military and civilian firefighters to extinguish fires in training and in response to Class B Fires.

3.      TOG is personal protective equipment designed for heat and moisture resistance in order to protect firefighters in hazardous situations. Most turnout gear is made up of a thermal liner, a moisture barrier, and an outer layer. The inner layers contain PFAS, and the outer layer is often treated with additional PFAS.

4.      Defendants, individually and collectively, designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold, handled, used, and/or otherwise released into the stream of commerce AFFF or TOG or underlying chemicals that were added to AFFF or TOG, with knowledge that the AFFF or TOG or underlying chemicals contained highly toxic and biopersistent PFAS, which would expose end users of the product to the risks associated with PFAS.

5.      The AFFF or TOG containing PFAS was used in fire emergency responses, fire-suppression systems, live fire training, and fire preparedness equipment testing ("Firefighting Activities").

6.      PFAS binds proteins in the blood of humans exposed to the material and remain and persist over long periods of time. Due to their unique chemical structure, PFAS accumulates in the blood and bodies of exposed individuals.

7.      PFAS are highly toxic and carcinogenic chemicals. Defendants knew, or should have

3

known, that PFAS remains in the human body and presents significant health risks to humans.

8.      The plaintiff was a firefighter at the Commonwealth of Puerto Rico Fire Department. The Commonwealth of Puerto Rico Fire Department. stored and used Defendants' AFFF containing PFAS chemicals and/or their precursor chemicals in Firefighting Activities.

9.      During his career as a firefighter, Plaintiff regularly used and was exposed to Defendants' AFFF containing PFAS chemicals and/or their precursory chemicals.

10.     Defendants' PFAS-containing AFFF and/or TOG products were used by Plaintiff in their intended manner, without significant change in the products' condition. Plaintiff was unaware of the dangerous properties of Defendants' AFFF and/or TOG products and relied on Defendants' instructions regarding the proper handling of the products.

11.     Plaintiff's consumption, inhalation and/or dermal absorption of PFAS from Defendants' AFFF and/or TOG products caused Plaintiff significant and devastating injury.

12.     Plaintiff was diagnosed with was diagnosed with hypothyroidism and colon cancer. Plaintiff suffered, and continues to suffer, the effects of his illness, which was caused by exposure to Defendants' AFFF and/or TOG products.

13.     Through this action, Plaintiff seeks to recover compensatory and punitive damages arising out of the permanent and significant damages sustained as a direct result of exposure to Defendants' AFFF and/or TOG products at various locations during the course of Plaintiff's Firefighting Activities. Plaintiff further seeks injunctive, equitable, and declaratory relief arising from the same.

## JURISIDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and 1332(c)(1) in that there is complete diversity among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because it is the judicial district in which the Plaintiff is a citizen, a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and the Defendants conduct business within the district.

16.    This Court has personal jurisdiction over the defendants because defendants have been doing business and conducted substantial business in the Commonwealth of Puerto Rico within the time period relevant to the causes of action stated herein, and because at all times relevant to this lawsuit, Defendants manufactured, designed, marketed distributed, released, promoted and/or otherwise sold, directly or indirectly, PFAS-containing AFFF or TOG products to various locations for use in fighting Class B fires, such that each Defendant knew or should have known that the products would be delivered to areas in the Commonwealth of Puerto Rico and used by Plaintiff during the course of performing Firefighting Activities. Therefore, the exercise of jurisdiction over Defendants by this Court does not offend traditional notions of fair play and substantial justice.

## PARTIES

17.    Plaintiff Victor Muñoz Serrano is a resident and citizen of Isabela, Commonwealth of Puerto Rico. Plaintiff regularly used, and was thereby directly exposed to, AFFF and/or TOG in training and to extinguish fires during his working career as a military and/or civilian firefighter.

18.    As a direct result to the exposure to AFFF and TOG, Plaintiff was diagnosed with hypothyroidism and colon cancer,  as a result of exposure to Defendants' AFFF and/or TOG products.

19.    Defendants are designers, marketers, developers, manufacturers, distributors, releasers, instructors, promoters, and sellers of PFAS-containing AFFF or TOG products or underlying PFAS-containing chemicals used in the production of AFFF or TOG products.

20.    Defendant, 3M Company, f/k/a Minnesota Mining and Manufacturing Company, ("3M"), is a Delaware corporation and does business throughout the United States, including conducting business in the Commonwealth of Puerto Rico. 3M has its principal place of business at 3M Center, St. Paul, Minnesota 55144.

21.    3M designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, from the 1960s until at least 2002, 3M designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

22.    Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation and does business throughout the United States, including conducting business in the Commonwealth of Puerto Rico. AGC has its principal place of business at 55 E. Uwchlan Ave., Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.

23.    AGC designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, AGC designed, marketed, developed, manufactured, distributed, released, trained users

on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

24.     Defendant Allstar Fire Equipment is a California corporation ("Allstar") and does business throughout the United States, including the Commonwealth of Puerto Rico. Allstar has its principal place of business at 12328 Lower Azusa Road, Arcadia, California 91006.

25.     Allstar developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in firefighting.

26.     Defendant Amerex Corporation ("Amerex") is an Alabama corporation and does business throughout the United States, including conducting business in the Commonwealth of Puerto Rico. Amerex has its principal place of business at 7595 Gadsden Highway, Trussville, Alabama 35173. Upon information and belief, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

27.     Amerex designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Amerex designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

28.     Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Archroma has its principal place of business at 5435 77 Center Drive, #10 Charlotte, North Carolina 28217. Upon information and belief, Archroma was formed when Clariant Corporation divested its textile

7

chemicals, paper specialties, and emulsions business to SK Capital Partners.

29.    Archroma designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Archroma designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

30.    Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Arkema has its principal place of business at 900 First Avenue, King of Prussia, Pennsylvania 19406. Upon information and belief, assets of Arkema's fluorochemical business were purchased by Defendant DuPont in 2002.

31.    Arkema designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Arkema designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

32.    Defendant BASF Corporation ("BASF") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. BASF has its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon

information and belief, BASF is the successor-in-interest to Swiss chemical company Ciba Holding, Inc, Ciba Corporation, Ciba-Geigy Corporation, and Ciba Specialty Chemicals Corporation.

33.    BASF designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, BASF designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

34.    Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Buckeye has its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

35.    Buckeye designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Buckeye designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

36.    Defendant Carrier Fire & Security Americas Corporation (f/k/a UTC Fire & Security Americas Corporation) ("Carrier Fire") is a Delaware corporation and does business throughout

the United States, including in the Commonwealth of Puerto Rico. Carrier Fire has its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

37.     Carrier Fire designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Carrier Fire designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

38.     Defendant Carrier Global Corporation ("Carrier Global") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Carrier Global has its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, Carrier Global was formed in 2020 when Defendant United Technologies Corporation spun off its fire and security business before merging with Raytheon Company, and Carrier Global became the parent company of Kidde-Fenwal, Inc., a manufacturer of AFFF. Upon information and belief, Kidde-Fenwal, Inc., is the successor in interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Upon information and belief, Carrier Global is the ultimate corporate parent and owner of Kidde-Fenwal, Inc., Carrier Fire & Security Americas Corporation, and Carrier Fire & Security Corporation.

39.     Carrier Global designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this

Complaint. Further, Carrier Global designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

40.    Defendant CB Garment, Inc. ("CrewBoss") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. CrewBoss has its principal place of business at 830 Wilson Street, Eugene, Oregon 97402.

41.    CrewBoss developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

42.    Defendant ChemDesign Products, Inc. ("ChemDesign") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. ChemDesign has its principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143.

43.    ChemDesign designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, ChemDesign designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

44.    Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Chemguard has its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, Chemguard was acquired by Tyco International Ltd. in 2011 and is a subsidiary of Johnson Controls International PLC. Upon information and belief, Chemguard acquired Ciba's

fluorosurfactants business in 2003.

45.     Chemguard designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Chemguard designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

46.     Defendant Chemicals Incorporated ("Chemicals") is a Texas corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Chemicals has its principal place of business at 12321 Hatcherville Road, Baytown, Texas 77521.

47.     Chemicals designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Chemicals designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

48.     Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, and does business throughout the United States, including in the Commonwealth of Puerto Rico. Chubb is a citizen of the United Kingdom, with its principal place of business in Blackburn, Lancashire, England. It is registered with Companies House in the United Kingdom, having registered number 134210, with its registered office at Chubb House, Shadsworth Road, Blackburn, Lancashire,

England, BB1 2PR.

49.    Chubb designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Chubb designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

50.    Defendant Clariant Corporation ("Clariant") is a New York corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Clariant has its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205. Upon information and belief, Clariant was formerly known as Sandoz Chemical Corporation and as Sodyeco, Inc.

51.    Clariant designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Clariant designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

52.    Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that conducts business throughout the United States, including in the Commonwealth of Puerto Rico. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief,

Corteva was formed in February 2018 as a wholly owned subsidiary of DowDuPont. On June 1, 2019, following a distribution to DowDuPont stockholders, DowDuPont spun off Corteva as a new, publicly traded company, which currently holds DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain DuPont liabilities.

53.    Corteva designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Corteva designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

54.    Defendant Daikin America, Inc. ("Daikin") is a Delaware corporation and does business throughout the United States, including conducting business in the Commonwealth of Puerto Rico. Daikin has its principal place of business in 20 Olympic Drive, Orangeburg, New York, 10692.

55.    Daikin designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

56.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Deepwater's principal place of business is at 196122 E County Road 40, Woodward, Oklahoma 73801.

57.    Deepwater designed, marketed, developed, manufactured, distributed, released, trained

users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Deepwater designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

58.     Defendant Dupont de Nemours, Inc. (f/k/a DowDuPont, Inc.) ("DowDuPont"), is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. DowDuPont, has its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. DowDupont was created in 2015 to transfer Chemours and DuPont liabilities for manufacturing and distributing flurosurfactants to AFFF manufacturers. On June 1, 2019, DowDuPont was the surviving entity after the spin-off of Corteva. It retained assets in the specialty products business lines following the spin-off as well as the balance of the financial assets and liabilities of E.I. DuPont de Nemours and Company not assumed by Corteva.

59.     DowDuPont designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, DowDuPont designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

60.     Defendant Dynax Corporation ("Dynax") is a Delaware corporation that conducts business throughout the United States, including in the Commonwealth of Puerto Rico. Its principal place

of business is 79 Westchester Avenue, Pound Ridge, New York 10576.

61.    Dynax designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Dynax designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

62.    Defendant EIDP, Inc. (f/k/a E.I. du Pont de Nemours and Company) ("DuPont"), is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. DuPont has its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. DuPont is a successor-in-interest to DuPont Chemical Solutions Enterprise, a Delaware corporation with its principal place of business in Delaware.

63.    DuPont designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, DuPont designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

64.    Defendant Fire-Dex, LLC ("Fire-Dex") is a limited liability company doing business throughout the United States, including in the Commonwealth of Puerto Rico. As a limited liability company, Fire-Dex's citizenship is determined by the citizenship of each of its members. Upon information and belief, the sole member of Fire-Dex, LLC is a citizen of the state of Ohio. Based upon a search of publicly available

sources, the sole member of Fire-Dex is not a citizen of the same state as Plaintiff.

65.     Fire-Dex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

66.     Defendant Fire Service Plus, Inc. ("Fire Service Plus") is a Georgia corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Fire Service Plus has its principal place of business at 473 Dividend Drive, Peachtree City, Georgia 30269.

67.     Fire Service Plus developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

68.     Defendant Globe Manufacturing Company LLC ("Globe") is a limited liability company doing business throughout the United States, including in the Commonwealth of Puerto Rico. As a limited liability company, Globe's citizenship is determined by the citizenship of each of its members. Globe is wholly owned by its single member, Globe Holding Company, LLC. Globe Holding Company, LLC is wholly owned by its single member, MSA Worldwide, LLC. MSA Worldwide, LLC is wholly owned by its single member, MSA Safety, Inc. MSA Safety, Inc. is a Pennsylvania corporation with its principal place of business at 1000 Cranberry Woods Drive, Cranberry Township, Pennsylvania, 16066. Upon information and belief, based upon a search of publicly available sources, none of Globe's members are citizens of the same state as Plaintiff. After acquiring Globe Holding Company, LLC, in 2017, MSA Safety, Inc. continues to do business under the Globe name.

69.     Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

70.     Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Honeywell has its principal place of business at 855 South Mint Street, Charlotte, North Carolina 28202.

71.     Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

72.     Defendant Innotex Corp. ("Innotex") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Innotex has its principal place of business at 2397 Harts Ferry Road, Ohatchee, Alabama 36271.

73.     Innotex developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

74.     Defendant Johnson Controls, Inc. ("Johnson Controls") is a Delaware corporation and does business throughout the United States, including conducting business in the Commonwealth of Puerto Rico. Johnson Controls has its principal place of business in 5757 N Green Bay Avenue, Glendale, Wisconsin.

75.     Johnson Controls designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying

76.     Defendant Kidde PLC, Inc. ("Kidde PLC") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Kidde PLC has its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, Kidde PLC was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

77.     Kidde PLC designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Kidde PLC designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in

Firefighting Activities.

78.     Defendant Lion Group, Inc. ("Lion") is an Ohio corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Lion has its principal place of business at 7200 Poe Avenue, Suite 400 Dayton, Ohio, 45414.

79.     Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

80.     Defendant L.N. Curtis & Sons ("L.N. Curtis") is a California corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. L.N. Curtis has its principal place of business at 185 Lennon Lane, Suite 110, Walnut Creek, California 94598.

81.     L.N. Curtis developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

82.     Defendant Milliken & Company ("Milliken") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Milliken has its principal place of business at 920 Milliken Road, Spartanburg, South Carolina 29303.

83.     Milliken developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

84.     Defendant MSA Safety Inc. ("MSA") is a Pennsylvania corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. MSA has its principal place of business at 1000 Cranberry Woods Drive, Cranberry Township, Pennsylvania, 16066. MSA acquired Globe Holding Company and its subsidiaries, including Globe, in 2017 and continues to do business under the Globe name.

85.     MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

86.     Defendant Municipal Emergency Services, Inc. ("MES") is a Nevada corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. MES has its principal place of business at 12 Turnberry Lane, Sandy Hook, Connecticut 06482.

19

87.    MES developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

88.    Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Nation Ford has its principal place of business at 2300 Banks Street, Fort Mill, South Carolina 29715.

89.    Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Nation Ford has its principal place of business at 2300 Banks Street, Fort Mill, South Carolina 29715.

90.    Nation Ford designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Nation Ford designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

91.    Defendant National Foam, Inc. ("National Foam") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. National Foam has its principal place of business at 141 Junny Road, Angier, North Carolina, 27501. Upon information and belief, National Foam merged with Chubb Fire Ltd. to form Chubb National Foam, Inc. in or around 1988. Chubb National Foam, Inc. is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security, Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. (collectively "Chubb"). Chubb was acquired by Williams Holdings in 1997. Upon information and belief,

Angus Fire Armour Corporation ("Angus Fire") had previously been acquired by Williams Holdings in 1994. Upon information and belief, Williams Holdings was demerged into Chubb and Kidde PLC in or around 2000. When Williams Holdings was demerged, Kidde PLC became the successor in interest to National Foam and Angus Fire. Kidde PLC was acquired by United Technologies Corporation in or around 2005. Angus Fire and National Foam separated from United Technologies Corporation in or around 2013.

92.     National Foam designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, National Foam designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

93.     Defendant PBI Performance Products, Inc. ("PBI") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. PBI has its principal place of business at 9800-D Southern Pine Boulevard, Charlotte, North Carolina 28273.

94.     PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

95.     Defendant Perimeter Solutions LP ("Perimeter") is a limited partnership doing business throughout the United States, including in the Commonwealth of Puerto Rico. As a limited partnership, Perimeter's citizenship is determined by the citizenship of each of its members. The sole member of Perimeter is Perimeter Solutions, Inc., which is a Delaware corporation with its principal place of business at 8000 Maryland Avenue, Suite 350, St. Louis, Missouri 63105. Upon information and belief, based upon a search of publicly available sources, the sole member of Perimeter is not a citizen of the

same state as Plaintiff.

96.      Perimeter developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

97.      Defendant Ricochet Manufacturing Co., Inc. ("Ricochet") is a Pennsylvania corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Ricochet has its principal place of business at  4700 Wissahickon Avenue, Number 112, Philadelphia, Pennsylvania 19144.

98.      Ricochet developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

99.      Defendant Safety Components Fabric Technologies, Inc. ("SCI") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. SCI has its principal place of business at 40 Emery Street, Greenville, South Carolina 29605.

100.     SCI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

101.     Defendant Southern Mills, Inc. ("Southern Mills") is a Georgia corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Southern Mills has its principal place of business at 6501 Mall Boulevard, Union City, Georgia 30291.

102.     Southern Mills developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

103.     Defendant Stedfast USA, Inc. ("Stedfast") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Stedfast has its principal place of business at 800 Mountain View Drive, Piney Flats, Tennessee 37686.

104.     Stedfast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

105.     Defendant The Chemours Company ("Chemours"), is a Delaware corporation and does business

throughout the United States, including conducting business in the Commonwealth of Puerto Rico. Chemours has its principal place of business 1007 Market Street, Wilmington, Delaware 19898. Upon information and belief, Chemours was spun off from DuPont in 2015 to assume PFAS related liabilities.

106.    Chemours designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

107.    Defendant The Chemours Company FC, LLC ("Chemours FC"), a successor-in-interest to DuPont Chemical Solutions Enterprise, is a limited liability company doing business throughout the United States, including in the Commonwealth of Puerto Rico. As a limited liability company, Chemours FC's citizenship is determined by the citizenship of each of its members. Upon information and belief, the sole member of Chemours FC is The Chemours Company, which is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Based upon a search of publicly available sources, the sole member of Chemours FC is not a citizen of the same state as Plaintiff.

108.    Chemours FC designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Chemours FC designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

109.    Defendant Tyco Fire Products, LP, as successor-in-interest to The Ansul Company ("Tyco"), is a limited partnership doing business throughout the United States, including in the Commonwealth of Puerto Rico. As a limited partnership, Tyco's citizenship is determined by the

citizenship of each of its members, Central Sprinkler LLC and Fire Products GP Holding, LLC. Fire Products GP Holding, LLC is wholly owned by its single member, Central Sprinkler, LLC, and takes its citizenship. Central Sprinkler LLC is wholly owned by its single member Tyco International Management Company, LLC, and takes its citizenship. Tyco International Management Company, LLC is wholly owned by its single member, Tyco Fire & Security US Holdings, LLC, and takes its citizenship. Tyco Fire & Security US Holdings LLC is wholly owned by its single member, Tyco Fire & Security (US) Management, LLC, and takes its citizenship. Tyco Fire & Security (US) Management, LLC is wholly owned by its single member, Johnson Controls US Holdings Inc. and takes its citizenship. Johnson Controls US Holdings Inc. is a Delaware corporation with its principal place of business located in the State of Wisconsin. Thus, Tyco Fire Products, LP is a citizen of Delaware and Wisconsin. Tyco is the successor-by-merger and name change to Ansul LLC, formerly known as Ansul, Incorporated, Wormald U.S., Inc., The Ansul Company, and Ansul Chemical Company. Ansul LLC merged with and into Tyco Fire Products in 2009. After said merger, Tyco manufactured and continues to manufacture the Ansul brand of products, including Ansul brand AFFF containing PFAS.

110.    At all times relevant, Tyco and/or Ansul designed, marketed, developed, manufactured, distributed released, trained users on, produced instructional materials for, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, Tyco and/or Ansul designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

111.    Defendant United Technologies Corporation (n/k/a RTX Corporation) ("United

Technologies") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. United Technologies has its principal place of business at 1000 Wilson Boulevard, Arlington, Virginia 22209.

112.    United Technologies designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities, which is the subject of this Complaint. Further, United Technologies designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in Firefighting Activities.

113.    Defendant Veridian Limited ("Veridian") is an Iowa corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Veridian has its principal place of business 3710 West Milwaukee Street, Spencer, Iowa 51301.

114.    Veridian developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

115.    Defendant W.L. Gore & Associates, Inc. ("Gore") is a Delaware corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico. Gore has its principal place of business at 555 Paper Mill Road, Newark, Delaware 19711.

116.    Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

117.    Defendant Witmer Public Safety Group, Inc. ("Witmer") is a Pennsylvania corporation and does business throughout the United States, including in the Commonwealth of Puerto Rico.

Witmer has its principal place of business at 104 Independence Way, Coatesville, Pennsylvania 19320.

118.    Witmer developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

119.    When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

120.    The term "AFFF Defendant" or "AFFF Defendants" refers to all Defendants named herein who designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that is used in Firefighting Activities which is the subject of this Complaint, jointly and severally, unless otherwise stated.

121.    The term "TOG Defendant" or "TOG Defendants" refers to all Defendants named herein who developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gear for use in Firefighting Activities.

## FACTUAL ALLEGATIONS

### A.    PFAS and their Hazardous Effects on Humans

122.    PFAS are a group of chemical compounds whose molecules consist of nearly indestructible chains of fluorine and carbon atoms. PFAS are entirely human-made and do not otherwise exist.

123.    There is not naturally occurring "baseline," normal, and/or acceptable level or rate of any

PFAS in human blood, as all PFAS detected and/or present in human blood is present and/or detectable as a direct and proximate result of the acts and/or omissions of Defendants.

124.    Prior to commercial development and large-scale manufacture and use of products containing PFAS, no such PFAS had been found or detected in human blood.

125.    By at least the end of the 1960s, animal toxicity testing performed by some Defendants manufacturing and/or using PFAS indicated that exposure to such materials, including at least PFOA, resulted in various adverse health effects among multiple species of laboratory animals, including toxic effects to the liver, testes, adrenals, and other organs and bodily systems.

126.    By at least the end of the 1960s, additional research and testing performed by some Defendants manufacturing and/or using PFAS indicated that such materials, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered.

127.    By at least the end of the 1970s, additional research and testing performed by some Defendants manufacturing and/or using PFAS indicated that one or more such materials, including at least PFOA and PFOS, because of their unique chemical structure, would bind to proteins in the blood of animals and humans exposed to such materials where such materials would remain and persist over long periods of time and would accumulate in the blood/bodies of the exposed individuals with each additional exposure.

128.    By at least the end of the 1980s, additional research and testing performed by some Defendants manufacturing and/or using PFAS indicated that PFOA, one such PFAS, had caused Leydig cell (testicular) tumors in a chronic cancer study in rats, resulting in at least one such Defendant, DuPont, classifying such PFAS internally as a confirmed animal carcinogen and possible human carcinogen.

129.    It was understood by some Defendants by at least the end of the 1980s that a chemical that caused cancer in animal studies must be presumed to present a cancer risk to humans unless the precise mechanism of action by which the tumors were caused was known and would not occur in humans.

130.    By at least the end of the 1980s, scientists had not determined the precise mechanism of action by which any PFAS caused tumors. Therefore, scientific principles of carcinogenesis classification mandated that Defendants presume any such PFAS material that caused tumors in animal studies could present a cancer risk to exposed humans.

131.    By at least the end of the 1980s, additional research and testing performed by some Defendants manufacturing and/or using PFAS, including at least DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

132.    By at least the end of the 1980s, some Defendants, including at least 3M and DuPont, understood that, not only did PFAS get into and persist and accumulate in the human blood and in the human body, but that once in the human body and blood, particularly longer-chain PFAS, such as PFOS and PFOA, they had a long half-life. This meant that it would take a very long time before even half of the material would start to be eliminated, which allowed increasing levels of the chemicals to build up and accumulate in the blood and/or bodies of exposed individuals over time, particularly if any level of exposure continued.

133.    By at least the end of the 1990s, additional research and testing performed by some Defendants manufacturing and/or using PFAS, including at least 3M and DuPont, indicated that

at least one such PFAS, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver, and pancreatic) in a second chronic cancer study in rats.

134.    By at least the end of the 1990s, the precise mechanism(s) by which PFAS caused each of the tumors found in animal studies had still not been identified, mandating that Defendants continue to presume that any such PFAS that caused such tumors in animal studies could present a potential cancer risk to exposed humans.

135.    By at least 2010, additional research and testing performed by some Defendants manufacturing and/or using PFAS, including at least 3M and DuPont, revealed multiple potential adverse health impacts among workers exposed to such PFAS, including at least PFOA, such as increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.

136.    When the United States Environmental Protection Agency ("USEPA") and state and local public health agencies and officials first began learning of PFAS exposure in the United States and potential associated adverse health effects, Defendants repeatedly assured and represented to such entities and the public that such exposure presented no risk of harm and was of no significance.

137.    After the USEPA and other entities began asking Defendants to stop manufacturing and/or using certain PFAS, Defendants began manufacturing, making, and/or using more of certain other and/or "new" PFAS, including PFAS materials with six or fewer carbons, such as GenX (collectively "Short-Chain PFAS").

138.    Defendants manufacturing and/or using Short-Chain PFAS, including at least DuPont and 3M, were aware that one or more such Short-Chain PFAS materials also had been found in human blood.

139.    By at least the mid-2010s, Defendants, including at least DuPont and Chemours, were aware that at least one Short-Chain PFAS had been found to cause the same triad of tumors- Leydig

(testicular), liver, and pancreatic- in a chronic rat cancer study as had been found in a chronic rat cancer study with a non-Short-Chain PFAS.

140.    Research and testing performed by and/or on behalf of Defendants making and/or using Short-Chain PFAS indicated that such Short-Chain PFAS materials presented the same, similar, and/or additional risks, including cancer risk, to human health as had been found in research on other PFAS materials.

141.    Nevertheless, Defendants repeatedly assured and represented to governmental entities and the public (and continue to do so) that the presence of PFAS, including Short-Chain PFAS, in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

142.    At all relevant times, Defendants, individually and/or collectively, possessed the resources and ability but have intentionally, purposefully, recklessly, and/or negligently chosen not to fund or sponsor any study, investigation, testing, and/or other research of any kind of the nature that Defendants claim is necessary to confirm and/or prove that the presence of any one and/or combination of PFAS in human blood causes any disease and/or adverse health impact of any kind in humans, presents any risk of harm to humans, and/or is of any legal, toxicological, or medical significance to humans, according to standards Defendants deem acceptable.

143.    Even after an independent science panel, known as the "C8 Science Panel," publicly announced in the 2010s that human exposure to 0.05 parts per billion or more of PFOA, one of the categories of PFAS, had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFAS in human blood at the

levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind. Defendants also have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate.

144.    PFAS and their components are associated with a wide variety of adverse health effects in humans.

145.    Exposure to Defendants' products containing PFAS has been linked to serious medical conditions including, but not limited to, kidney cancer, testicular tumors, testicular cancer, liver cancer, pancreatic cancer, prostate cancer, leukemia, lymphoma, bladder cancer, thyroid disease, thyroid cancer, ulcerative colitis, colorectal cancer, breast cancer, endometrial cancer, multiple myeloma, infertility, hypercholesterolemia, and pre-eclampsia.

## B.    AFFF Defendants' History of Manufacturing and Selling AFFF

146.    Aqueous Film-Forming Foam ("AFFF") is a combination of chemicals used to extinguish Class B Fires.

147.    AFFF containing fluorinated surfactants has better firefighting capabilities than water due to its surfactant-tension lowering properties which allow the compound(s) to extinguish fire by smothering, ultimately starving it of oxygen.

148.    AFFF is a Class B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

149.    PFAS have been used for decades in the manufacture of AFFF.

150.    AFFF was introduced commercially in the mid-1960s and rapidly became the primary firefighting foam in the United States and in other parts of the world. It contains PFAS, which are highly fluorinated synthetic chemical compounds whose family includes PFOS and PFOA.

151.    3M began producing PFOS and PFOA by electrochemical fluorination in the 1940s.  In the 1960s, 3M used its fluorination process to develop AFFF.

152.    3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s.

153.    National Foam and Tyco/Ansul began to manufacture, market, and sell AFFF in the 1970s.

154.    Buckeye began to manufacture, market, and sell AFFF in the 2000s.

155.    In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF. 3M, in its press release announcing the phase out, stated "our products are safe," and that 3M's decision was "based on [its] principles of responsible environment management."  3M further stated that "the presence of these materials at [] very low levels does not pose a human health or environmental risk."  In communications with the EPA at that time, 3M also stated that it had "concluded that…other business opportunities were more deserving of the company's energies and attention…"

156.    Following 3M's exit from the AFFF market, the remaining AFFF Defendants continued to manufacture and sell AFFF that contained PFAS and/or its precursors.

157.    AFFF Defendants knew their customers warehoused large stockpiles of AFFF. In fact, AFFF Defendants marketed their AFFF products by touting its shelf-life. Even after AFFF Defendants fully understood the toxicity of PFAS, and their impacts to the health of humans following exposure, AFFF Defendants concealed the true nature of PFAS. While AFFF Defendants phased out production or transitioned to other formulas, they did not instruct their customers that they should not use AFFF that contained PFAS and/or their precursors. AFFF Defendants further did not act to get their harmful products off the market.

158.    AFFF Defendants did not warn public entities, firefighter trainees who they knew would foreseeably come into contact with their AFFF products, or firefighters employed by civilian and/or

military employers that the use of and/or exposure to AFFF Defendants' products containing PFAS and/or their precursors would pose a danger to human health.

159.   Plaintiff directly used, was exposed to, and/or was given AFFF to conduct Firefighting Activities on a regular basis.

160.   Plaintiff was never informed that AFFF containing PFAS was inherently dangerous. Nor was Plaintiff warned about the known health risks associated with this product.

161.   Plaintiff never received or was told to use any protective gear to guard against the known dangerous propensities of this product.

162.   AFFF Defendants have known of the health hazards associated with AFFF and/or its compounds for decades and that in their intended and/or common use would harm human health.

163.   Information regarding AFFF and its compounds was readily accessible to each of the above-referenced AFFF Defendants for decades because each is an expert in the field of AFFF manufacturing and/or the materials needed to manufacture AFFF, and each has detailed information and understanding about the chemical compounds that form AFFF products.

164.   AFFF Defendants' products were unreasonably dangerous, and AFFF Defendants failed to warn of this danger.

165.   AFFF Defendants have each designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, promoted, sold, and/or otherwise handled AFFF containing PFAS and/or underlying chemicals containing PFAS used in AFFF production. The AFFF and underlying chemicals were used by entities around the country, including military, county, and municipal firefighting departments.

166.   AFFF Defendants have each designed, marketed, developed, manufactured, distributed, released, trained users on, produced instructional materials for, sold, and/or otherwise handled

AFFF containing PFAS and/or underlying chemicals containing PFAS used in AFFF production, in such a way as to cause the contamination of Plaintiff's blood and/or body with PFAS, and the resultant biopersistence and bioaccumulation of such PFAS in the blood and/or body of Plaintiff.

167.    AFFF Defendants, through their manufacturing, distribution and/or sale of AFFF, and through their involvement and/or participation in the creation of training and instructional materials and activities, knew, foresaw, and/or should have known and/or foreseen that Plaintiff and those similarly situated would be harmed.

### C.    PFAS-Containing Turnout Gear

168.    During Firefighting Activities, firefighters and other emergency workers wear turnouts that are intended to provide a degree of thermal, chemical, and biological protection. Turnout gear components include individual components such as a helmet, hood, jacket, pants and suspenders, boots, and gloves. Each component of the jacket and pants is made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from ambient heat.

169.    PFAS chemicals are used in turnout gear to provide heat, water, and stain resistance to the outer shell and moisture barrier of turnout gear.

170.    A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed, and sold in 2008, 2014, and 2017, by six turnout gear makers, including TOG Defendants Globe, Lion and Honeywell and found high levels of PFAS in turnout gear worn, used, or handled by firefighters, including Plaintiff.

171.    When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust, exposing firefighters to PFAS chemicals, particles,

and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation. Further firefighter exposure to these highly mobile and toxic materials occurs through normal workplace activities because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' personal vehicles, homes, and families.

172.    Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980 internal memo, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic." The memo concluded "continued exposure is not tolerable."

173.    As alleged herein, Plaintiff wears and/or wore turnouts in the ordinary course of performing Plaintiff's duties, as the turnouts were intended to be used in a foreseeable manner, which exposed Plaintiff to significant levels of PFAS.

174.    Plaintiff did not know, and in the exercise of reasonable diligence could not have known, that the turnouts Plaintiff wore or used in the course of performing Plaintiff's duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that Plaintiff routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts Plaintiff wore or used in performing Plaintiff's duties.  The turnout gear worn or used by Plaintiff did not and does not contain labeling information saying that the gear contained PFAS, and similarly did not and does not warn Plaintiff of the health risks associated with exposure to PFAS.

Across the country, many firefighters only had one set of turnouts for years and would wash their turnouts at home and/or in station machines along with their daily station wear uniforms.

175.    Plaintiff was never informed that this product was inherently dangerous. Nor was Plaintiff warned about the known health risks associated with this product.

D.    Defendants' Knowledge, Actions, and Inactions

176.    Defendants' manufacture, distribution and/or sale of AFFF or TOG containing PFAS, resulted in many individuals, including Plaintiff, who came in contact with the chemicals, was diagnosed with hypothyroidism and colon cancer.

177.    At all relevant times, Defendants shared and/or should have shared among themselves all relevant information relating to the presence, biopersistence, and bioaccumulation of PFAS in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

178.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiff from discovering the existence and extent of any injuries/harm as alleged herein.

179.    At all relevant times, Defendants, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any potential adverse health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with the presence of PFAS in human blood.

180.    At all relevant times, Defendants, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would have

properly and fully alerted Plaintiff to the legal, toxicological, medical, or other significance and/or risk from having any PFAS material in Plaintiff's blood and/or body.

181.    At all relevant times, Defendants encouraged their customers and others to continue and even further increase their use of PFAS by continuing to manufacture, use, and release AFFF containing PFAS or TOG containing PFAS.

182.    At all relevant times, Defendants tried to encourage and foster the increased and further use of PFAS in connection  with  as  many products, uses, and applications as possible, despite having knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities.

183.    To this day, Defendants deny that the presence of any PFAS in human blood, at any level, is an injury or presents any harm or risk of harm of any kind, or is otherwise of any legal, toxicological, or medical significance.

184.    To this day, Defendants deny that any scientific study, research, testing, or other work of any kind has been performed that is sufficient to suggest to the public that the presence of any PFAS material in human blood, at any level, is of any legal, toxicological, medical, or other significance.

185.    Defendants, to this day, affirmatively assert and represent to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States causes any health impacts or is sufficient to generate an increased risk of future disease sufficient to warrant diagnostic medical testing, often referring to existing studies or data as including too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions.

186.    Defendants were and/or should have been aware, knew and/or should have known,  and/or

foresaw or should have foreseen that their design, marketing, development, manufacture, distribution, release, training and response of users, production of instructional materials, sale and/or other handling and/or use of AFFF or TOG containing PFAS would result in the contamination of the blood and/or body of Plaintiff with PFAS, and the biopersistence and bioaccumulation of such PFAS in Plaintiff's blood and/or body.

187.    Defendants were and /or should have been aware, or knew and/or should have known, and/or foresaw or should have foreseen that allowing PFAS to contaminate the blood and/or body of Plaintiff would cause injury, irreparable harm, and/or unacceptable risk of such injury and/or irreparable harm to Plaintiff.

188.    Defendants did not seek or obtain permission or consent from Plaintiff before engaging in such acts and/or omissions that caused, allowed, and/or otherwise resulted in Plaintiff's exposure to AFFF or TOG containing PFAS and the contamination of Plaintiff's blood and/or body with PFAS materials, and resulting biopersistence and bioaccumulation of such PFAS in Plaintiff's blood and/or body.

## CAUSES OF ACTION

## COUNT I – NEGLIGENCE

189.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

190.    Defendants had a duty to individuals, including Plaintiff, to exercise reasonable ordinary, and appropriate care in the manufacturing, design, labeling, packaging, testing, instruction, warning, selling, marketing, distribution, and training related to the AFFF or TOG product.

191.    Defendants breached their duty of care and were negligent, grossly negligent, reckless and willful as described herein in the design, manufacture, labeling, warning, instruction, training,

selling, marketing, and distribution of the AFFF or TOG products and/or underlying PFAS-containing chemicals used in AFFF or TOG production in one or more of the following respects:

a)  failing to design the products so as to avoid an unreasonable risk of harm to individuals, including Plaintiff;

b)  failing to use reasonable care in the testing of the products so as to avoid an unreasonable risk of harm to individuals, including Plaintiff;

c)  failing to use appropriate care in inspecting the products so as to avoid an unreasonable risk of harm to individuals, including Plaintiff;

d)  failing to use appropriate care in instructing and/or warning the public as set forth herein of risks associated with the products, so as to avoid unreasonable risk of harm to individuals, including Plaintiff;

e)  failing to use reasonable care in marketing, promoting, and advertising the products so as to avoid unreasonable risk of harm to individuals, including Plaintiff;

f)  otherwise negligently or carelessly designing, manufacturing, marketing, distributing, and warning; and

g)  selling and/or distributing a product which was inherently dangerous to the public.

192.  As a direct and proximate result of Defendants' negligence, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic loss, and damages including, but not limited to medical expenses, lost income, and/or other damages.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT II – BATTERY

193.  Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

194.    At all relevant times, Defendants possessed knowledge that the AFFF or TOG containing PFAS which they designed, engineered, manufactured, fabricated, sold, handled, released, trained users on, produced instructional materials for, used, and/or distributed was bio- persistent, bio-accumulative, toxic, potentially carcinogenic, and/or otherwise harmful/injurious and that their continued manufacture, use, sale, handling, release, and distribution would result in Plaintiff having PFAS in Plaintiff's blood and/or body, and the biopersistence and bioaccumulation of such PFAS in Plaintiff's blood and/or body.

195.    However, despite possessing such knowledge, Defendants knowingly, purposefully, and/or intentionally continued to engage in such acts and/or omissions, including but not limited to all such acts and/or omissions described in this Complaint, that continued to result in Plaintiff accumulating PFAS in Plaintiff's blood and/or body, and such PFAS persisting and accumulating in Plaintiff's blood and/or body.

196.    Defendants did not seek or obtain permission or consent from Plaintiff to put or allow PFAS materials into Plaintiff's blood and/or body, or to persist in and/or accumulate in Plaintiff's blood and/or body.

197.    Entry into, persistence in, and accumulation of such PFAS in Plaintiff's body and/or blood without permission or consent is an unlawful and harmful and/or offensive physical invasion and/or contact with Plaintiff's person and unreasonably interferes with Plaintiff's rightful use and possession of Plaintiff's blood and/or body.

198.    At all relevant times, the PFAS present in the blood of Plaintiff originated from Defendants' acts and/or omissions.

199.    Defendants continue to knowingly, intentionally, and/or purposefully engage in acts and/or omissions that result in the unlawful and unconsented-to physical invasion and/or contact with

Plaintiff that resulted in persisting and accumulating levels of PFAS in Plaintiff's blood and/or body.

200.    Plaintiff, and any reasonable person, would find the contact at issue harmful and/or offensive.

201.    Defendants acted intentionally with the knowledge and/or belief that the contact, presence, and/or invasion of PFAS with, onto and/or into Plaintiff's blood serum, including their persistence and accumulation in such serum, was substantially certain to result from those very acts and/or omissions.

202.    Defendants' intentional acts and/or omissions resulted directly and/or indirectly in harmful contact with Plaintiff's blood and/or body.

203.    The continued presence, persistence, and accumulation of PFAS in the blood and/or body of Plaintiff are offensive, unreasonable, and/or harmful, and thereby constitute a battery.

204.    The presence of PFAS in the blood and/or body of Plaintiff altered the structure and/or function of such blood and/or body parts. As a direct result to the exposure to AFFF and TOG, Plaintiff was diagnosed with hypothyroidism and colon cancer.

205.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff suffered physical injury for which Defendants are therefore liable.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT III – INADEQUATE WARNING

206.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

207.    Defendants knew or should have known:

    a)    exposure to AFFF or TOG containing PFAS was hazardous to human health;

    b)    the manner in which they were designing, marketing, developing, manufacturing, distributing, releasing, training, instructing, promoting, and selling AFFF or TOG containing PFAS was hazardous to human health; and

    c)    the manner in which they were designing, marketing, developing, manufacturing, marketing, distributing, releasing, training, instructing, promotion and selling AFFF or TOG containing PFAS would result in the contamination of Plaintiff's blood and/or body as a result of exposure.

208.    Defendants had a duty to warn of the hazards associated with AFFF or TOG containing PFAS entering the blood and/or body of Plaintiff because they knew of the dangerous, hazardous, and toxic properties of AFFF or TOG containing PFAS. Defendants failed to provide sufficient warning to purchasers that the use of their AFFF or TOG products would cause PFAS to be released and cause the exposure and bioaccumulation of these toxic chemicals in the blood and/or body of Plaintiff.

209.    Adequate instructions and warnings on the AFFF and/or TOG containing PFAS could have reduced or avoided these foreseeable risks of harm and injury to Plaintiff. If Defendants had provided adequate warnings:

    a)    Plaintiff could have and would have taken measures to avoid or lessen exposure; and

    b)    end users and governments could have taken steps to reduce or prevent the release of PFAS into the blood and/or body of Plaintiff. Defendants' failure to warn was a direct and proximate cause of Plaintiff's injuries from PFAS that came from the use, storage, and disposal of AFFF and/or TOG containing PFAS. Crucially, Defendants' failure to provide adequate and sufficient warnings for the AFFF or TOG containing PFAS they designed, marketed, manufactured, distributed, released, promoted, and sold renders the AFFF or TOG a defective product.

210.    Defendants were negligent in their failure to provide Plaintiff with adequate warnings or instruction that the use of their AFFF or TOG products would cause PFAS to be released into the

blood and/or body of Plaintiff. As a result of Defendants' conduct and the resulting contamination, Plaintiff suffered severe personal injuries by exposure to AFFF and/or TOG containing PFAS.

211.    Defendants' negligent failure to warn directly and proximately caused the harm to and damages suffered by Plaintiff.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT IV – DESIGN DEFECT

212.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

213.    Defendants knew or should have known:

    a)    exposure to AFFF or TOG containing PFAS is hazardous to human health;

    b)    the manner in which AFFF or TOG containing PFAS was designed, manufactured, marketed, distributed, and sold was hazardous to human health; and

    c)    the manner in which AFFF or TOG containing PFAS was designed, manufactured, marketed, and distributed, could and would release PFAS into Plaintiff and cause the exposure and bioaccumulation of these toxic and poisonous chemicals in the blood and/or body of Plaintiff.

214.    Knowing of the dangerous and hazardous properties of the AFFF or TOG containing PFAS, Defendants could have designed, manufactured, marketed, distributed, and sold alternative designs or formulations of AFFF or TOG that did not contain hazardous and toxic PFAS. These alternative designs and formulations were already available, practical, and technologically feasible. The use of these alternative designs would have reduced or prevented reasonably foreseeable harm to Plaintiff caused by Defendants' design, manufacture, marketing, distribution, and sale of AFFF or TOG containing hazardous and toxic PFAS.

215.    The AFFF or TOG containing PFAS that was designed, manufactured, marketed, distributed, and sold by Defendants was so hazardous, toxic, and dangerous to human health that the act of designing, formulating, manufacturing, marketing, distributing, and selling this AFFF was unreasonably dangerous under the circumstances.

216.    The AFFF or TOG designed, formulated, manufactured, marketed, distributed, and sold by Defendants was defectively designed and the foreseeable risk of harm could and would have been reduced or eliminated by the adoption of a reasonable alternative design that was not unreasonably dangerous.  Defendants' defective design and formulation of AFFF or TOG containing PFAS was a direct and proximate cause of the contamination of the blood and/or body of Plaintiff and the persistence and accumulation of PFAS in Plaintiff's blood and/or body.

217.    Defendants' defective design and formulation of AFFF or TOG containing PFAS caused the contamination described herein resulting in personal injuries to Plaintiff. As a direct result of the harm and injury caused by Defendants' defective design and the contamination described herein, Plaintiff has been exposed to AFFF and/or TOG containing PFAS and other toxic substances. As a direct result to the exposure to AFFF and TOG, Plaintiff was diagnosed with hypothyroidism and colon cancer.

218.    Defendants' negligent failure to design a reasonably safe product directly and proximately caused the harm to and damages suffered by Plaintiff.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT V – STRICT LIABILITY (STATUTORY)

219.    Plaintiff hereby incorporates by reference the allegations contained in the preceding

paragraphs of this Complaint as if restated in full herein.

220.    Plaintiff asserts any and all remedies available under Puerto Rico's general tort statute, Article 1536 of the Puerto Rico Civil Code of 2020, dictates that "any person who, through fault or negligence, causes damage to another, is obliged to repair it." PR Laws Ann. tit. 31 § 1080  for strict liability against each Defendant.

221.    Defendants were engaged in designing, manufacturing, marketing, selling, and distributing AFFF or TOG.

222.    The AFFF or TOG was in a defective condition and unreasonably dangerous to users and/or consumers when designed, manufactured, marketed, sold, and/or distributed to the public by Defendants.

223.    As a direct and proximate result of Defendants' products' aforementioned defects, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic loss, and damages including, but not limited to medical expenses, lost income, and other damages.

224.    Defendants are strictly liable in tort to Plaintiff for their wrongful conduct.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT VI – STRICT LIABILITY (COMMON LAW)

225.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

226.    Plaintiff brings strict product liability claims under common law.

227.    As designed, manufactured, marketed, tested, assembled, equipped, distributed and/or sold

by Defendants, the AFFF or TOG products were in a defective and unreasonably dangerous condition when put to reasonably anticipated use by foreseeable consumers and users, including Plaintiff.

228.    Defendants had available reasonable alternative designs which would have made the AFFF or TOG products safer and would have most likely prevented the injuries and damages to Plaintiff, thus violating state common law.

229.    Defendants failed to properly and adequately warn and instruct Plaintiff as to the proper safety and use of Defendants' products.

230.    Defendants failed to properly and adequately warn and instruct Plaintiff regarding the inadequate research and testing of the products.

231.    Defendants' products are inherently dangerous and defective, unfit, and unsafe for their intended and reasonably foreseeable uses, and do not meet the expectations for the performance of the products.

232.    As a proximate result of Defendants' design, manufacture, marketing, sale, and distribution of the products, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, and economic damages.

233.    By reason of the foregoing, Defendants are strictly liable for the injuries and damages suffered by Plaintiff, caused by these defects in the AFFF and/or TOG products.

234.    As to strict liability, Puerto Rico has adopted the principles set forth in *Restatement (Second) of Torts* § 402A (1965), with the exception that it has rejected the "unreasonably dangerous" requirement of § 402A. A manufacturer is liable in tort on a theory of strict liability

when it places a product on the market, knowing that it is to be used without inspection for defects, and it has a defect that *causes* injuries.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT VII – FRAUDULENT CONCEALMENT

235.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

236.    Throughout the relevant time period, Defendants knew that their products were defective and unreasonably unsafe for their intended purpose.

237.    Defendants fraudulently concealed from and/or failed to disclose to or warn Plaintiff and the public that their products were defective, unsafe, and unfit for their intended purposes, and that they were not of merchantable quality.

238.    Defendants were under a duty to Plaintiff and the public to disclose and warn of the defective and harmful nature of the products because:

a)      Defendants were in a superior position to know the true quality, safety, and efficacy of Defendants' products;

b)      Defendants knowingly made false claims about the safety and quality of Defendants' products in documents and marketing materials; and

c)      Defendants fraudulently and affirmatively concealed the defective nature of Defendants' products from Plaintiff.

239.    The facts concealed and/or not disclosed by Defendants to Plaintiff were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or use Defendants' products.

240.    Defendants intentionally concealed and/or failed to disclose the true defective nature of the products so that Plaintiff would use Defendants' products. Plaintiff justifiably acted or relied upon, to Plaintiff's detriment, the concealed and/or non-disclosed facts as evidenced by Plaintiff's use of Defendants' products.

241.    By concealing and/or intentionally failing to disclose material information about the dangers, defects, and lack of safety and effectiveness of Defendants' products, Defendants prevented Plaintiff from acquiring such material information. Defendants are subject to the same liability to Plaintiff for Plaintiff's pecuniary loss as if Defendants had affirmatively stated the non-existence of such material information. Defendants are therefore liable for fraudulent concealment under all applicable laws.

242.    As a proximate result of Defendants' conduct, Plaintiff has been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT VIII – BREACH OF EXPRESS AND IMPLIED WARRANTIES

243.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

244.    At all times relevant hereto, Defendants manufactured, marketed, labeled, and sold the AFFF or TOG products that have been previously alleged and described herein.

245.    At the time Defendants designed, developed, marketed, sold, labeled, and distributed the AFFF or TOG products, Defendants knew of the use for which they were intended, and implied

and/or expressly warranted that the products were merchantable, safe, and fit for their intended purpose.

246.    Defendants warranted that the products were merchantable and fit for the particular purpose for which they were intended and would be reasonably safe. These warranties were breached, and such breach proximately resulted in the injuries and damages suffered by Plaintiff.

247.    Plaintiff is within the class of foreseeable users and reasonably relied upon Defendants' judgment, and the implied and/or express warranties in using the products.

248.    Defendants breached their implied and/or express warranties and did not meet the expectations for the performance of the products when used for their intended purpose and were neither of merchantable quality nor safe for their intended use in that the products have a propensity to cause serious injury, pain, and was diagnosed with hypothyroidism and colon cancer.

249.    Puerto Rico law permits an action for damages against a remote manufacturer of a defective product that causes personal harm or property damage and recognizes a breach of express warranty cause of action.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT IX – WILLFUL AND WANTON MISCONDUCT

250.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

251.    Defendants and their employees, agents, officers, and representatives owed a duty of care to end users of their AFFF or TOG products, including Plaintiff.

252.    Defendants breached the duty of care owed to Plaintiff.

253.    The actions of Defendants and their employees, agents, officers, and representatives were willful and wanton and exhibited a reckless disregard for the life, health, and safety of the end users of Defendants' AFFF or TOG products, including Plaintiff.

254.    As a proximate and foreseeable consequence of the actions of Defendants, Plaintiff was exposed to unreasonably dangerous toxic PFAS-containing AFFF and/or TOG, which caused Plaintiff's injuries.

WHEREFORE, Plaintiff prays judgments against Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## COUNT X  -  FRAUDULENT TRANSFER, 6 DEL. C. § 1304
## (DUPONT DEFENDANTS)

255.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

256.    Under Delaware Code Title 6, § 1304:

(a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1)    With actual intent to hinder, delay or defraud any creditor of the debtor; or

(2)    Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

a.    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b.    Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

257.    Plaintiff is a "Creditor" possessing "Claims" against DuPont Defendants as those terms are defined in Delaware Code Title 6, § 1301.

258.    DuPont Defendants have acted with actual intent to hinder, delay, and defraud DuPont's creditors.

259.    Assets and liabilities were transferred between DuPont Defendants, whereby certain DuPont Defendants did not receive a reasonably equivalent value in exchange for the transfer and they were engaged in, or were about to engage in, a business for which the remaining assets were unreasonably small and/or they intended to incur or reasonably should have believed that they would incur debts beyond their ability to pay as the debts became due.

260.    Upon information and belief, DuPont Defendants engaged in a complicated restructuring of DuPont for the purpose of shielding assets from creditors such as Plaintiff, with claims related to PFAS contamination.

261.    Upon information and belief, at the time of this restructuring, DuPont Defendants knew that their liabilities related to PFAS were likely in the billions of dollars.

262.    In the initial step of restructuring, DuPont formed Chemours in 2015 as a wholly owned subsidiary. In July 2015, DuPont spun off Chemours, transferring DuPont's Performance Chemicals Unit along with a vast amount of environmental liabilities – including all those related to PFAS. As part of the transfer, Chemours transferred valuable assets to DuPont, including a $3.9 billion dividend to DuPont stockholders, for which Chemours incurred additional debt to pay.

263.    Upon information and belief, the Chemours spin-off was not bargained at arm's length. At the time of the spin off, Chemours had a separate board, but was controlled by DuPont employees.

264.    Upon information and belief, DuPont transferred to Chemours a disproportionately small allocation of assets to cover debts and liabilities. Dupont transferred less than 20% of its business line, but over 66% of its environmental liabilities and 90% of DuPont's pending litigation. These liabilities were taken on by Chemours in addition to the $3.9 billion debt it assumed to pay a

dividend to DuPont's shareholders. As a result, Chemours did not receive reasonably equivalent value in exchange for the transfer of debts and obligations from DuPont.

265.    In its valuation, DuPont purposefully undervalued the potential maximum liability from the PFAS liabilities it transferred to Chemours. At the time of the spin-off, DuPont had been sued, threatened with lawsuits, and had knowledge of forthcoming litigation regarding DuPont's liabilities for damages and injuries from the manufacture, sale, and worldwide use of PFAS-containing products. DuPont and Chemours knew or should have known that Chemours would incur debts beyond its ability to pay as they came due.

266.    In further restructuring, DuPont sought to further protect its assets from PFAS liabilities by first merging itself with Dow and then separating its now-comingled assets among three newly created companies: DowDuPont, Inc. ("DowDuPont") (which later became New DuPont); Dow, Inc. ("New Dow"), and Corteva.

267.    As a result of the merger, Dow and DuPont became wholly owned subsidiaries of DowDupont. Upon information and belief, after the merger, DowDupont underwent a hidden internal reorganization with the net effect being the transfer of a substantial portion of its valuable assets to DowDupont for less than the assets were worth. Upon information and belief, the transactions were intended to frustrate and hinder creditors with claims against DuPont, including with respect to PFAS liabilities.

268.    As a result of this internal organization, all of Dow and DuPont's assets were reshuffled into three divisions: the Agriculture Business, the Specialty Products Business, and the Material Sciences Business.

269.    On June 1, 2019, the DuPont Defendants completed the final step of the restructuring by spinning off two newly publicly traded entities, Corteva and New Dow. Generally, the assets

related to the Agriculture Business division were allocated to Corteva; the assets related to the Material Science Business were allocated to New Dow; and the assets related to the Specialty Products Business remained with DowDupont, which then became New DuPont. DuPont became a wholly owned subsidiary of Corteva.

270.    Upon information and belief, Corteva and New DuPont assumed responsibility for some of DuPont's historic PFAS liabilities.

271.    Upon information and belief, during the restructuring, DuPont's assets were transferred to Corteva and New DuPont for far less than their actual value. At the end of these transactions, DuPont divested approximately half of its tangible assets, totaling roughly $20 billion.

272.    The net result of the restructuring was that DuPont's extensive PFAS liabilities were moved to an underfunded company, Chemours, and that DuPont's extensive assets were further shielded by merging them with Dow's assets and then transferring them to Corteva and New DuPont for far less than their value.

273.    Plaintiff has been harmed by these transactions, which were designed to shield assets from creditors such as Plaintiff, and Plaintiff has been damaged by DuPont Defendants' conduct.

274.    Plaintiff is entitled to void these transactions and to recover property or value transferred under 6 Del. C. § 1307.

WHEREFORE, Plaintiff prays judgments against DuPont Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit, just, and proper.

## TOLLING OF THE STATUTE OF LIMITATIONS
### Discovery Rule Tolling

275.    Plaintiff had no way of knowing about the risk of serious injury associated with the use of

and exposure to PFAS until very recently.

276.    Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to PFAS is harmful to human health.

277.    Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and exposure to PFAS; nor would a reasonable and diligent investigation by Plaintiff have disclosed that PFAS could cause personal injury.

278.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

## Fraudulent Concealment Tolling

279.    All applicable statutes of limitations also have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

280.    Instead of disclosing critical safety information regarding AFFF or TOG, Defendants have consistently and falsely represented the safety of AFFF or TOG products.

281.    This fraudulent concealment continues through the present day.

282.    Due to this fraudulent concealment, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

283.    Under Puerto Rico law equitable tolling applies in situations where a damage was willfully and wrongfully concealed by its author.

## Estoppel

284.    Defendants were under a continuous duty to consumers, end users, and other persons coming into contact with their products, including Plaintiff, to accurately provide safety

information concerning their products and the risk associated with the use of and exposure to AFFF or TOG.

285.   Instead, Defendants knowingly, affirmatively, and actively concealed safety information concerning AFFF or TOG and the serious risks associated with the use of and exposure to AFFF or TOG.

286.   Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgments against all Defendants, jointly and severally, on each of the above-referenced claims and Causes of Action as follows:

Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

Punitive and/or exemplary damages for the wanton, willful, fraudulent, and/or reckless acts of Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of Plaintiff and of the general public, and to Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

Awarding Plaintiff's attorneys' fees;

Awarding Plaintiff the costs of these proceedings; and

Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully Submitted, in San Juan, Puerto Rico, this 4th.  of June, 2024.

**WEISBROD MATTEIS & COPLEY PLLC**
/s/ Juan Saavedra-Castro
Juan Saavedra-Castro
USDC 204712
E-mail: jsaavedra@wmclaw.com

/s/Wilma E. Reverón Collazo
USDC 204802
E-mail: wreveron@wmclaw.com

290 Ave. Jesús T. Pinero, Suite 1201
San Juan, Puerto Rico 00918
Telephone: (787) 474-0244


**ENVIRONMENTAL LITIGATION GROUP, P.C.**
/s/ Gregory A. Cade
Gregory A. Cade *
Gary A. Anderson*
Kevin B. McKie *
ENVIRONMENTAL LITIGATION GROUP, P.C.
2160 Highland Avenue South
Birmingham, AL 35205
Telephone: (205) 328-9200
Facsimile: (205) 328-9456

- Not admitted at USDCPR. Will be requesting admission Pro Hac Vice.